Your Honor, Marty Harper for the Applebee's. We have two issues here today. We have the supplemental briefing with respect... Could you speak into the microphone? We have the supplemental briefing with respect to the two questions that were presented by the court. You have our supplemental brief on that point. We do believe that the McCaskill Bond portion of the appeal is a USAPA that they have a 24-month statute of limitations is not correct. The statute of limitations under the RLA applies only to a department of an administrative group under the RLA. The more appropriate statute of limitations is probably a 90-day statute. What does the statute of limitations mean, the time within which to take an appeal? From the Preliminary Arbitration Board. Really what they want to do is to hold their challenge to the Preliminary Arbitration Board until this entire process is done sometime and take it in in early 2017 to try to do whatever it is. So we think the McCaskill Bond is moot. We don't believe that that portion of the appeal ought to be vacated. And with respect to the DFR, we've tried to articulate for you the harm that we think that the West Pilots would do after the substantive integration process has been completed. See if you can help me figure out what's going to happen in these negotiations. So the other side is going to say, look, we don't have, we don't know what, we don't know what's going to come out of out of these negotiations. We don't know what kind of seniority list is going to do. So your DFR claim is just premature. So is this a negotiation between two groups of pilots, the American Pilots and the U.S. Air Pilots, which now includes the Air West Pilots? Or is it a negotiation among three groups, Air West, U.S. Air, and American? It's a good question, Judge Bybee, and it's one that we think that the trial court just missed. What we are going into right now in the substantive integration process, which begins on June 19, is that you have three merger committees participating in the process. You have a West merger committee that was appointed by APA in the New York Times as a bargaining representative. You have the USAPA merger committee that was permitted to continue to participate by APA. And then you have the American Pilots merger committee. So all three are participating in this process. It's a little unique in the sense that in order to integrate the American Pilots with the former U.S. Airways Pilots, there has to get to one list on the U.S. Airways side. So you have three groups, two of which have to negotiate an interim agreement before they can negotiate with American? No, there will be no negotiated list between these two pilots given the eight years of controversy we've had over what list it will be. So the process will be when we get to the hearings that begin or the arbitration on June 29, USAPA goes first. And they will try to convince, I believe, the panel that they ought to take a U.S. Airways East Pilot list, which more likely than not is going to be something like a date of hire list with some bells and whistles attached to it, and shuffle that list with the American list. The West merger committee is going to take a different position, and they will be trying to convince the panel that they ought to take the NICOLAO list, perhaps with some refinement, and then integrate that list with the American list to come up with a final and binding list at the end of the year. So is it your position then that if we were to say now that the duty of fair representation had been violated, that that negotiation would take place in a different way, with different positions by the parties? It will not take place in a different way, because they've already signed a protocol agreement, and we have ground rules for the hearing, the arbitrations to go forward on schedule, as I've set forth in our position. So those arbitration proceedings will take place. If you found that there was a breach of the DFR, then, and the NICOLAO award should have been used going forward versus the list that they want to use, it will probably have some effect, I can't tell you as I stand here today, on the arbitration panel on what list they might select. Whatever you decide on the DFR, if you decided now that there was a breach, that decision is not binding on the panel. They don't need to take that decision and use it. And is it binding on one or more of the, what you've called, merger committees? It's going to be, they don't have a DFR position anymore. They're not our bargaining representative. The landscape has changed substantially since then. I don't think technically, Your Honor, that I can stand here and say to you it's going to be binding on them to step back and to use. So if we were to find a DFR on the part of U.S. APA, what effect would it have on the negotiations going on, starting in June? We would have something different to argue, something more to argue, something more substantial. But it's all rhetorical at that point, right? Pardon me? It's all rhetorical. It's not like the union has got a seat at the table and all of a sudden has to change its negotiating position because it's been found to have a duty of fair representation that it's violated with its past position. That is probably correct, Judge Bybee, because they are no longer our bargaining representative, and therefore — Let me — Mr. Harper, let me ask the question a little bit differently, the same question that Judge Bybee asked. In other words, if we conclude that the DFR was violated, you want injunctive relief, what would the injunction say in these terms? It will — it should say that, indeed, USAPA, when it was our bargaining representative, violated its DFR by not using — No, it was the U.S. APA. The U.S. APA violated, all right, and so — By not using the Nikolau award as part of the MOU, because coming forward from the — But so far, you've just described the violation. So what's the injunctive relief you want? You command the USAP to do something? We — the injunctive relief, when we filed the complaint back in — No, now. Now. We can't get injunctive relief because — Can't get it. That's my point. Because they are no longer our bargaining representative. That's right. So — So why is there a live controversy? Aren't you sort of suggesting — yeah, aren't you suggesting it's moot, the DFR is also moot? The DFR is not moot in the sense that if we don't get a decision with respect to whether they violated their DFR and you put it off, if you ever get around to doing that again, it's going to be after the seniority integration process is over, and we will have lost our right to make the argument to the panel under these circumstances that USAPA breached the DFR but not using the — But one of the requirements for us to adjudicate something like this is that there be some form of actual effective relief that is available. And I'm struggling, as my colleagues are, to figure out what that would be in the present circumstances, even with respect to the duty of fair representation. The relief is a declaration that our bargaining representative breached its DFR at a point in time when they had the obligation to follow the transition agreement and implement the Nicolau Award back in 2014. You just want a declaratory judgment. You don't want an injunction. No. We just want it declared what they should have done, and then allow us, what remains of our time. It's just rhetorical club, isn't it? Well, it's more than rhetorical. It's just something from the — it's just a note from the Court that says, it looks like you've been wronged here at some point. It's more than a note, because technically this is really not moot, because our DFR is still alive because you can give us some relief. You can give us a  But we shouldn't have — when we get to this next state, we should not have to be arguing against them. And if we issued that kind of declaration, would the — would the two different merger committees that represent West and U.S. Air then be working off of a Nicolau list? Perhaps, if the panel allows the Nicolau list to be used. I don't know what the panel is going to do. If you tell them — When you say the panel, you mean the arbitration panel? Yes. The next panel, the next arbitration board that — Let me back up a little bit there now. You mentioned a June 29 hearing. That's a hearing before the arbitration board. Yes. The board that was selected to hear this seniority — seniority — I don't want to call it dispute — Integration. Seniority integration problem, right? Yes, Your Honor. At which now your group has a standing to, you know, in effect be a party, right? Right. Thanks to a determination by AP. Now, is June 29 — is that the first hearing? That's the first hearing date. There are 16 set aside, Your Honor. There — Sixteen days. Over what period of time? Starting on June 30, completing, if needed, on October 16. There's a break in between. So all indications are that the — that arbitration panel probably intends to issue its decision well before December 15. No. But right now it is obligated, pursuant to the MOU and the protocol they've signed, to issue that decision not later than December 9, 2015. Not later than December 9? Yes. All right. But it looks like they're on track to meet that deadline without asking for any extension, right? Right now. But everybody has — if they ask for more time, everybody's agreed to give them more time. Yeah. All right. All right. But it will — it will — it will, if the decision is made quickly — and we asked you to look at it under Rule 39 and to make a determination whether there was a breach of the DFR — it will, more likely than not, change the dynamics of what takes place in these hearings that will come about. And it will advantage the West Pilots if it is determined — I think — if it's determined there was a breach of the DFR. We will have gotten what we were entitled to, we believe, when we are in front of Judge Silver, a determination that from that point on, the NICOLAU should have been used in these processes. We wouldn't have to be fighting them at the table in these next processes to set their list aside and to take our list. That's the stress that Judge Silver put us in by not declaring that there was a breach of the DFR. As you know, Mr. Harper, in the supplemental briefing, someone or maybe some parties have taken the position that we should put off deciding the DFR. In fact, I think some people even suggested we shouldn't hold this hearing today because, you know, by mid-December, the DFR issue will be moved. With all due respect, Your Honor, that is the position USOP has taken, and it's consistent with the position that they've taken ever since May of 2001. Time is on their side. So if they can convince you to give them more time, we're going to be at the end of this process in January where, candidly, they have run us out of altitude and airspeed. We are going to crash. You can help us not to crash by giving us the DFR decision now, so perhaps we can use it going forward. That's where we are. And a little time I have left. With respect to the DFR, fundamentally, we believe, if you go to the Court's opinion, pages 9 and 10, the Court lost its way at that particular point in time. We got to the end of that two-day trial after all sorts of discovery, asking everybody on their side we could think of, what was the legitimate union purpose for disregarding the Nicolau Award? Coming out of the DEC action, sometimes referred to as Addington 2, two things from that opinion carried over into the Addington 2, Addington 3. One, the TA agreement was binding on USOPA, transition agreement, a point in footnote 3 that this Court said was troublesome. We got it resolved in the DEC action. And two, a determination by Judge Silver that if they deviated from the Nicolau Award, they had to have a legitimate union purpose to do so. We set the litigation up to ask them, what's your legitimate union purpose? Just Polly, who was sitting at the table over his head, and it was participant, I don't know. Gary Hummel, the president of the union, I don't know. Everybody pointed their finger to Mr. Sierminski. He knew what the legitimate purpose was. They did not put it in the record at all, made no effort. Well, he tried, didn't he? Pardon me? He tried to put it in the record. He's right? No, he tried to put it in the record. Well, standing up in the back of the courtroom and trying to shout out an argument where we had subpoenaed him to give a deposition and they opposed it. So he tried, and I think Judge Silver did the right thing in shutting him down. But as we walked out of that courtroom on October 23, no legitimate reason, legitimate purpose was put into the record. We come to find out after the fact that Judge Silver presented one for them. For them. Sui sponte. That was the, what was that, the pay increase? Well, she, yes. I mean, that's what happened, Your Honor. She took the MOU as a whole that had substantial economic benefits in both for the West Pilots and the East Pilots, especially the East Pilots. They had gone almost 10 years without a pay raise. So there were some really good benefits, not only in the MOU, but in the subsequent joint collective bargaining agreement that was ratified at the end of January 30th. A lot of good benefits. She suggested, and I think incorrectly, that in order to make sure that this would pass up here, it was okay to pass on the seniority issue pursuant to what she found to be neutral language and 10-H, which is not neutral at all, and put off until another day a determination on seniority. And I just pointed out to you when that's going to occur. If this goes forward without being stopped after January 2017. She did not under- What does all that come down to in these terms? Is that an erroneous finding of fact, or is that an erroneous legal conclusion? It's an erroneous legal conclusion based upon the record that she had in front of her. There was no legitimate union purpose. And we went through this thing in detail. The isolated paragraph 10-H, it came into the MOU pursuant to an email that Mr. Siermanski sent on December 10, 2012. We asked everybody, was there a quid pro quo for including 10-H into the MOU? None. None whatsoever. So no aggregate benefit was gained by putting 10-H into the MOU. The only repercussion from the 10-H in the MOU was USAPA walked away, didn't apply, didn't adhere to the transition agreement, and did not apply at that particular point in time the Nicolau Award. And we're sitting here today trying to gather some of that back so that we perhaps have a chance to use it in the next seven months of what might be the last issues over seniority that started in May of 2007. Counsel, did you want to reserve a couple of minutes? I'll reserve two minutes and 15 seconds. Thank you. Good. Thank you. Your Honor, Pat Siermanski for the U.S. Airline Pilots Association. Let me begin by saying under the current situation, it is three merger committees, one representing the West pilots, the former America West pilots, one representing the U.S. Airline Pilots Association, the Union, and one representing the American pilots. This is not a negotiation, Your Honor, respectfully, but it is a procedure under the federal statute, the McCaskill Bond Amendment. So, Counsel, you've got three merger committees, one representing the West pilots. Now, the second one is our representatives from the Union. Yes. So that's USAPA. Yes. So if we were to find that there's a DFR here, presumably the representatives from USAPA would have to implement the NICOLA agreement or at least recommend it. I think that if there is an injunction, we're going to have to obey it, Your Honor. What if there's just a declaration? If there's just a declaration, then they can argue that to the panel. Well, wouldn't conscientious Union representatives follow the declaration, even if it wasn't accompanied by an injunction? Your Honor, it would depend on exactly what it is and what it says and going forward. You said there was a DFR. Wouldn't they have a duty of fair representation at that point? No. Actually, USAPA, the Union, is no longer the representative. It's the Allied Pilots Association. Frankly, Your Honor, that's one of the problems in this case with the remedy that they seek. They seek a remedy to essentially reform the Memorandum of Understanding, which is an agreement among four parties. American Airlines, US Airways, which were separate at the time, now are consolidated and they're one. The Allied Pilots Association, which is the Union representing the American pilots and the Union formally representing the US Airways pilots. And two of those parties were never parties in the district court. But they have sought throughout this litigation declaratory relief as well as injunctive relief, at least as I read the complaint. And among other things, that USAPA violated the duty of fair representation. So that's been something they've sought all along. And I guess the question for us now is, what difference would it make? And I think that's what we're all struggling with. Your Honor, the McCaskill-Bond Amendment provides for a procedure that begins at the point where the merger occurred. And essentially, what they want is they want the court to give them the relief to say, look, at the point where the merger occurred, there should have been not two lists of pilots. Because ever since the America West merger in 2005, there have been two separate seniority lists and two separate seniority systems at US Airways. And on December 9th of 2013, when the merger occurred, there were two at US Airways and there was one list at American. And what they're saying is, is they want relief that would say that on that date, in fact, there weren't two lists, but there was one list. And it was this Nicolau list that's there. They can't get that relief without having the Memorandum of Understanding, which was negotiated by four parties, changed in a way that those parties didn't negotiate. Well, I understand that there seems to be some controversy over what paragraph 10H means and what that MOU actually says. Some suggest that it just means that the Nicolau agreement is not binding, and others suggest that it's just neutral, that it could be used, but it's not necessarily to be used, depending on which of those. Your Honor, there was testimony at trial, not mine, and I'd urge you at some point to look at the two pages, which actually winds up to be 20 lines of the trial transcript at pages 310 and 311 that created this whole thing. I first of all don't think that that situation is relevant to the issue that's before the Court at this point, which is whether or not USAPA at that point was required to include the Nicolau award. I don't think that if you look at that, what happened there, that you'll find that there was anything improper about what happened there. And in any event, it's beside the point because there is testimony from three or four other witnesses about 10H. I'm sorry. You referred to pages 310 and 311. Yes. What pages are those of what? Whose testimony? Well, it was the part where I offered a stipulation. It was in the midst of the test. You're not referring to matters that are in the ER. This is in the trial transcript? This is in the trial transcript, which is not part of the excerpts of record, Your Honor. But there was testimony by several other witnesses about paragraph 10H. Most of them said they didn't have any idea how it got there. They thought maybe you had something to do with it. Most of them went limp on the stand. That's not completely accurate either, Your Honor. Let me first make a comment about the record in this case below. It was originally a preliminary injunction hearing, which was advanced to trial on the merits under the federal rules. And so we had a record that was made up not only of the transcript of the testimony that was given at trial and trial exhibits, there were also excerpts of depositions, there were declarations, and there were stipulations of fact all together to make the record in this case. And there is testimony concerning paragraph 10H in the deposition of Jess Pauley, which was part of the excerpts of record at pages 86 and 87, Mr. Colello's trial testimony at pages 274 and 275 of the trial testimony, the deposition of John Owens at pages 108 and 109, and a section, and unfortunately I don't have the page numbers of President Hummel's deposition as well about paragraph 10H. So there was testimony at trial and there were facts in the record about it. And the counsel is, this is a question that Judge Tashima asked opposing counsel, and that is when the district court determined that there was a legitimate union purpose for the inclusion of that paragraph, is that a finding of fact or a conclusion of law? How do we review it? I think, Your Honor, frankly, that it is a legal finding based on facts that were found by the judge. So it's mixed. Mixed question, which is the standard of review for duty of fair representation issues generally. And with respect to the duty of fair representation issue, let me say that in that particular time, for the mixed question, the facts were that there was a memorandum of understanding that, as I said, was negotiated by four parties. The evidence in the record is that when negotiations for that memorandum of understanding began, three of the parties, American Airlines, U.S. Airways, and the We don't want to treat seniority in this agreement. We're going to get an agreement with the pilots concerning the wages and conditions that will apply once the merger occurs, and the seniority issue will be addressed through the McCaskill bond process. If you're not comfortable with that, we're not going to have an agreement here because we're not going to treat it. It's got to be neutral with respect to that particular issue. In fact, the MOU, as the record shows, included significant wage and benefit increases for all of the pilots, both the East pilots and the West pilots at U.S. Airways. Nobody at the trial before Judge Silver mentioned that as a quid pro quo. Well, there was no quid pro quo, Your Honor, for any specific provision in the memorandum of understanding. The quid pro quo, when you negotiate something in a collective bargaining agreement, there are a bunch of things that usually the employer in this situation wants, and there are a number of things that the union or unions in this situation wants. And you can't say that any particular thing is a quid pro quo for a particular provision in the memorandum of understanding. There's a bunch of pluses and a bunch of minuses, and that's what collective bargaining is like. And, in fact, the testimony at trial from Ken Holmes, who was a West pilot who was on the trial. Well, you know, you can carry that principle too far, because if you can't say, then, you know, you can never determine that there was a union purpose in the stand that was taken on the Nikola Award, because they got nothing in return. You can't ever say they did. The union purpose, Your Honor, is the wide range of reasonableness that the union has with respect to the entire agreement. It's not with respect to one particular part of the agreement. It's a give and take overall. And I've agreed to split my time 10 minutes, our time 10 minutes. I'm over that. Let me ask you one more question. Sure. In terms of whether we could issue some kind of injunction, assuming we found that the DFR was violated, the USAPA, in a sense, is still acting as the pilot union in the McCaskill bond negotiations, isn't it? In other words, you remember Judge Silver's reasons for concluding that the West pilots couldn't participate in the McCaskill bond proceedings was because people who could participate were limited to the certified bargaining representative, or something like that, which is USAPA, right? Yes, at the time. So that union is still ongoing and has a part to play under federal labor law. So we could issue an injunction against the USAPA, couldn't we, that, yes, you've got to comply with the Nicolau Award? You would — if you were going to issue an injunction, it would have to be against USAPA because they're the party to the litigation, and they're the only — they're the only person you can reach in that situation. You have to have a party. Well — The problem is, is that — Well, no one else that's taking part in the — in the McCaskill bond proceedings except the West pilots cares what happens on this issue, right? Well — American Law doesn't care. The APA doesn't care. I mean, it's your problem. As long as you settle it, you know, they don't care how it comes out. Isn't that right? There are — Your Honor, I — they may not care, on the other hand, in terms of the integration of seniority. It may be effects that are as a result of what you do that has an effect on how those three lists go together. There are another — there are a number of other misconceptions. I think they're addressed in the brief with respect to what Mr. Harper said, but I'm really trenching on Mr. Siegel's time at this point. Okay. And I certainly don't want to cut off the Court's questions to Mr. Szymanski, but I'm Robert Siegel for U.S. Airways, and our issue is rather limited. The carrier has been strictly neutral on the duty of fair representation issue from the beginning in Judge Silver's court and has no stake in the argument about the order of pilots on the seniority list or whether there was or was not a breach of the duty of fair representation. We've — we're on record with regard to that point. Our involvement was limited to the fact that we were urging Judge Silver to resolve the issue as quickly as possible. We've had the burden of a merger in 2005, which was never consummated on the labor front. We never — we never integrated — we never operated with an integrated list from that day till today because of this dispute. And now we have a second merger with American Airlines, and — Does — does American — does U.S. Air — I'm sorry, you represent American — U.S. Airways and American Airlines. U.S. Airways is the — You represent the new entity. I represent the new entity, yes. Do you have a seat at this table, at this negotiating table? Yes. We're under — in the arbitration that's just going to begin in June 16th. If we were to say that there was a DFR, if we just issued a declaratory judgment that there had been a breach of the duty of fair representation by the — by USAPA, does that affect — does that affect you? Does that affect these negotiations at all? Well, it's — it's an arbitration, Your Honor, and it — we're — we have a provision in the MOU that says the carrier is neutral with regard to the formulation of the seniority list. We're a party there to ensure that there's a fair and equitable process, but we have — we have said to the parties in the arbitration agreement, the MOU, that we are neutral as to the order of the pilots on the list, as to the use of NICOLAO and the like. Our only position in this litigation was that we wanted a fair and equitable process, which is required by McCaskill-Bahn, and to our view below, the — that process warranted a separate — at the very least, a separate committee for the West pilots. Does the airline have a view as to whether any of the other parties in this arbitration would — would be affected by a simple declaratory judgment without an injunction? I can tell you my — I don't — we haven't taken a litigation position on DFR, but I believe the argument from the other side was that since NICOLAO was never implemented, the status quo, East list and West list, should be implemented with American. I believe these two groups are, through their merger committees, are going to be presenting those disparate arguments to the — to the three arbitrator panel, the McCaskill-Bahn panel. So I — I did not mention DFR as being moot in my Rule 28 letter because I thought that the remedy being sought wasn't — had not yet been resolved, so that's why we didn't mention it. If this Court were to decline to issue any ruling at all at this time, allow this to go forward, and the NICOLAO agreement were not used or didn't end up being the list for the — for the Air West — U.S. Air pilots, is there any — is there any remedy for the — for the Air West pilots at the end of that? There's — under the federal law, McCaskill-Bahn, it's supposed to be a final and binding arbitration decision, but there's going to be the normal very, very limited grounds for appeal, but they are not — So basically, they would have no remedy at that point. If — let's assume for the sake of the question that there was a violation, they would essentially have no remedy once the arbitration is complete. Again, we haven't briefed it or taken a position below, but I think the correct statement of the law to this panel upon question is that it's a final and binding arbitration decision under McCaskill-Bahn with extremely limited grounds for review, not — Which would not include something of this kind, probably. It would not include, usually, that you're wrong, the panel of arbitrators, but it would include, for example, you've exceeded your jurisdiction, that type of thing. Right. Mr. Siegel, since you're answering questions as an all-around rarely labor law expert, let me ask you another one, which I'm curious about. How did it — and the papers don't show this. How did it come about, after Judge Silver held that the West Pilots were not entitled to a seat at the McCaskill-Bahn proceedings, that they got a seat anyway? How did that happen? Well, it was a changed circumstance. What happened in Judge Silver's court is USAPA was still the certified representative under the Railway Labor Act, and they opposed a separate committee for the West. And the issue before Judge Silver was whether the West was entitled to such a committee, even though their certified union opposed it. Right. And the narrow issue decided by Judge Silver was, when the certified union opposes it, you can't have a separate committee. What happened was, after the merger with American, the National Mediation Board certified the American Pilots Union, APA, as the certified representative for all the pilots, including U.S. Airways pilots, and USAPA lost its certification, at that point APA favored allowing a merger committee for each seniority list, East and West. USAPA opposed APA's doing that, and so there was an agreement between USAPA, APA, and the carrier to submit that to a preliminary McCaskill-Bond panel, which then decided APA had the authority and ought to exercise. And so because of the changed union certification, the ruling was West could have a committee, not because it was entitled in the face of opposition from its union, but because its new union was entitled. And that's how we changed. And frankly, that's why when we were in Judge Silver's court, the company believed that there should be a fair process with each group having its own committee, and that's why we brought an action as intervener under McCaskill-Bond. And that's why I thought it became moot when the remedy essentially has been granted under a different theory by the McCaskill-Bond panel. All right. Now, although by design, there is very limited judicial review of the decision of the McCaskill-Bond arbitrators, which is true of all labor arbitrations, but undoubtedly that arbitration panel will be made aware of the Nicolau Arbitration Award, if it doesn't already know. And so I'm sure they're going to consider it, right? Well, I truly don't. Don't you think so? I believe that Mr. Harper plans to present it as part of the evidence when we start the hearing in June. I don't know how the panel will deal with the subject. So one way or another, it's going to come to the attention of the board, and even if we issue an injunction, that's all that the USAPA can do. It says, well, you know, we're under obligation to advocate the Nicolau Award, and we advocate the Nicolau Award. I mean, that's nothing more than, you know, telling the arbitration board that here's what the Nicolau Arbitration Panel found. And they're going to know that anyway, aren't they? As I understand it, at this arbitration, that the Merger Committee for the West will present as part of the evidence that award, because that's what they said they were going to do. I don't know what the panel will do with that. And the reason I didn't mention DFR in my Rule 28 letter is because I didn't understand that to be the requested remedy, just to be able to present it in that fashion. In contrast, I did think the McCaskill-Bahn issue, the remedy had been granted  later. Let me ask you a simple question. Do you agree that the limitation for filing a notice of appeal was 90 days and not two years? I think it's more, it's unsettled because this is a new statute, McCaskill-Bahn, and there's no precedent on the statute of limitations. But I think, just my own judgment is that it's more likely that the statute is 90 days than it is two years. Ninety days is the borrowed state statute for vacating arbitration awards, and that's been recognized as a rule in federal court. The two years that Mr. Schimansky has mentioned is something that was developed for railroad system boards of adjustment and has been applied in the airline industry, but it's not In a different context. In an interpretation of collective bargaining agreement disputes, not McCaskill-Bahn. So we don't have on the books a court decision on the statute applicable to McCaskill-Bahn. But one would certainly see the argument that it's not two years. Otherwise, we're going to have seniority lists generated by McCaskill-Bahn arbitrators and then have two years to wait to see if they're going to be implemented and then challenged. It doesn't make much sense. But at that time, there will be another merger. I don't think there's enough airlines left. But, Your Honor, if I could just make one factual correction. The question was, I think this had to do with the suggestion about holding everything until December. And the question was whether the McCaskill-Bahn panel was going to be on time. The hearing schedule was extended into October because of attorney availability. At the time, the panel said to us, said to all the parties, that it believed it was going to need more time because if the hearing ended in October, it would not be prepared to issue a decision in December. And asked the parties if they would be willing to cooperate by extending that deadline if the panel asked for it later this year. And all the parties said, yes, sir, we will be. So I don't know that they're going to ask, but they hinted that they're going to ask. And ask for the more time than. But when they ask for time, you're just speaking of a few months, right? You're not talking about two years. No, a few months, yes. I think if they got the hearing done in October, there's a briefing process, and then there's a comment period on the draft opinion before the final opinion comes out. So it'd be a few months. I did not understand the idea of waiting until December because there's, because the argument from USAPA was that they have a two-year statute and we've got the situation with the panel. So I did not perceive that the situation is somehow resolved in December in the way suggested in USAPA's brief. Okay. Thank you very much. Thank you. You have some rebuttal time remaining. Mr. Harper? A couple of minutes, Your Honor. Thank you. Judge Bybee, the question you asked Mr. Schmansky, if you issued a declaration, would they follow it? In very careful language, he gave you the answer, is that perhaps they would be obligated to file it or follow it, but that committee is not because that's not part of USAPA anymore. So the person that we have to be directed to is the USAPA merger committee and whether they would follow it or not. Judge Tsuchiyama, I'd like to go back in your point of making a declaration on Nicolau at this particular point in time, and what I'd like you to think about is the scales of justice. And by making that declaration at this particular point in time, as we move in to this last hearing, perhaps that at this late date, almost seven years after we started this fight, the scales of justice would tip our way so that we would have an obligation because they are going to know about the Nicolau Award. And if the added information was that USAPA should have used the Nicolau Award at the point in time when we ratified the MOU or they agreed to the MOU. And by the way, the West Pilots were not involved in those negotiations. Again, it was USAPA who was there putting language into the MOU that benefited or didn't benefit the West Pilots. And on the point of 10H being neutral or not being neutral, it is not neutral. You go into the record and go into Judge Silver's opinion. And in her opinion, and there was evidence in the record, when Mr. Cheminsky and others on the committees went to the East Pilots, unequivocally they said to the East Pilots that Nicolau is dead based upon the MOU, 10H. When they went and stood in front of our pilots, it's neutral. Go ahead and vote for the MOU because this language is neutral. We're here today and showing you what has occurred since then in the upcoming processes. It was not neutral because they have gone forward and suggested that the only list that ought to be used in this upcoming arbitration by the panel is their day-to-hire list. That's the list that they wrote, Mr. Bradford did, May 16, 2007. We want to have the day-to-hire at the next merger. We are at that merger, seven years. That's been their sole objective. And we need help now to go back to this arbitration panel and say they made a big mistake back in 14 or 13, and we should be able to argue to the panel now, take the Nicolau and use it when you shuffle our list, the U.S. Airways list, with the American pilots. Thank you, counsel. Thank you. We appreciate the arguments of all three counsel. It's been very helpful, and the case just argued is submitted, and we stand adjourned.
judges: Tashima, Graber, Bybee